MARC P. BERGER
REGIONAL DIRECTOR
Sanjay Wadhwa
Sheldon L. Pollock
John O. Enright
Tejal D. Shah
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0121 (Shah)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                     Plaintiff,<br><br>     -against-<br><br>JEFFREY AUERBACH,<br>JARED MITCHELL, and<br>RICHARD BROWN,<br><br>                     Defendants. | COMPLAINT<br><br>19 Civ. _____ ( )<br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Jeffrey Auerbach ("Auerbach"), Jared Mitchell ("Mitchell"), and Richard Brown ("Brown") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1. From approximately July 2014 through October 2015 (the "Relevant Period"), Auerbach, a former registered representative (*i.e.*, a stockbroker) and purported investor-relations professional; Mitchell, a purported investor-relations professional recently imprisoned for a previous securities fraud conviction; Richard Brown, a then-registered stockbroker; and Gino M.

Pereira ("Pereira"), the then-CEO of Nxt-ID, Inc. ("NXTD"), a "security technology" company and public issuer with common stock traded on the Nasdaq Capital Market, defrauded investors by knowingly or recklessly engaging in a stockbroker bribery scheme.

2. During the Relevant Period, Pereira caused NXTD to enter into purported "consulting agreements" with investor-relations companies owned by Auerbach and Mitchell to provide a pretense through which he could funnel bribes to Brown. That is, Pereira wired monies out of NXTD's bank account to the entities' bank accounts under the guise that the wires were payments for legitimate investor-relations services, when Pereira, Mitchell, and Auerbach knew that Mitchell and Auerbach would use at least some portion of the funds to bribe Brown to buy NXTD stock in his customers' accounts.

3. In sum, Pereira sent Mitchell and Auerbach at least $136,000, and Mitchell and Auerbach paid Brown at least $20,000 in cash bribes, in exchange for Brown recommending and buying more than $750,000 worth of NXTD common stock in his customers' accounts, without disclosing the fact or amount of the bribes he received to those customers.

## VIOLATIONS

4. By virtue of the foregoing conduct and as alleged further herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

5. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6. The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

7. The Commission seeks a final judgment: (a) permanently enjoining each defendant from engaging in the acts, practices, and courses of business alleged here against him and from committing future violations of the provisions of the federal securities laws he is alleged to have violated; (b) ordering Defendants to disgorge the ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Mitchell and Brown from participating in any offering of a penny stock, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

9. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

10. Venue lies in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Eastern District of New York.  Among other things, Brown communicated with the Defendants, communicated with his customers, and bought

NXTD stock in his customers' accounts while working in his offices on Staten Island and Long Island in the Eastern District of New York.

## DEFENDANTS

11.     **Auerbach**, age 49, resides in New York, New York.  During the Relevant Period, Auerbach purported to provide investor-relations services to NXTD through two entities: Excelsior Global Advisors ("Excelsior"), an entity for which he and Mitchell served as principals, and World Wide Holdings LLC, an entity for which he served as the lone principal. From approximately September 1993 to November 2013, Auerbach was a registered representative associated with a series of broker-dealers registered with the Commission.  On July 15, 2015, Auerbach consented to findings by the Financial Industry Regulatory Authority ("FINRA") that he had violated FINRA Rule 2010 by engaging in undisclosed private securities transactions while working as a registered representative in 2008 and 2009.  Auerbach was fined $15,000 and suspended from associating with any FINRA member firm for 90 days.  While working as a registered representative, Auerbach was the subject of multiple customer complaints alleging, among other things, unsuitability and breach of fiduciary duty.

12.     **Mitchell**, age 37, was recently incarcerated at the U.S. Penitentiary in Lewisburg, Pennsylvania.  Mitchell purported to provide investor-relations services to NXTD prior to the Relevant Period while employed at another investor-relations firm and then during the Relevant Period through Excelsior and Mitchell & Sullivan Holdings, LLC ("M&S Holdings"), an entity for which he served as a principal.  In 2016, the Commission sued Mitchell and Brown, and a grand jury in the Eastern District of New York indicted Mitchell and Brown, for their roles in another fraudulent broker bribery scheme relating to the securities of ForceField Energy Inc. Mitchell pleaded guilty in the criminal action and consented to a final judgment against him in

4

the Commission's action.  *See United States v. Mitchell et al.*, 16 Cr. 234 (E.D.N.Y.) (Docket Entry # 94) (hereinafter, "*U.S. v. Mitchell*") and *SEC v. St. Julien et al.*, 16-cv-2193 (E.D.N.Y.) (Docket Entry # 46) (hereinafter, "*SEC v. St. Julien*").

13.     **Brown**, age 40, resides in North Bellmore, New York.  During the Relevant Period, he was a registered representative associated with a Staten Island-based broker-dealer ("Broker-Dealer-1") who worked out of Broker-Dealer-1's Long Island Office.  From approximately November 1999 to May 2016, Brown was a registered representative associated with a series of broker-dealers registered with the Commission.  Brown was the subject of multiple customer complaints alleging, among other things, unsuitability and excessive trading.  In 2016, Brown was sued by the Commission in *SEC v. St. Julien* and indicted by a grand jury in the Eastern District of New York in *U.S. v. Mitchell*.

## FACTS

### I. THE FORCEFIELD ENERGY INC. CHARGES

14.     On May 13, 2016, the Commission filed a civil injunctive action in this court against Mitchell, Brown, and others for their roles in a broker bribery scheme relating to the securities of ForceField Energy Inc.  *See SEC v. St. Julien*.  Brown and Mitchell were arrested the same day and indicted by a grand jury in the Eastern District of New York for substantially the same conduct alleged in the Commission's complaint.  *See U.S. v. Mitchell*.  Mitchell pled guilty to the criminal charges and consented to a final judgment against him in the Commission's action.  *See U.S. v. Mitchell* (Docket Entry # 94); *SEC v. St. Julien* (Docket Entry # 46).

### II. AUERBACH AND MITCHELL ACTED AS INTERMEDIARIES TO FUNNEL BRIBES FROM PEREIRA TO BROWN TO PURCHASE NXTD STOCK

15.     During the Relevant Period, Pereira retained firms run by Auerbach and/or Mitchell for the purported purpose of providing investor-relations services to NXTD, with the

5

understanding that Auerbach and Mitchell would use at least some portion of the fees that they received to pay bribes to Brown to purchase NXTD stock in his customers' accounts.

16. In sum, Pereira sent Mitchell and Auerbach at least $136,000, and Mitchell and Auerbach paid Brown at least $20,000 in cash bribes, in exchange for Brown recommending and buying more than $750,000 worth of NXTD common stock in his customers' accounts. Brown's customers were harmed because unbeknownst to them, Brown's decision to invest their money in NXTD was based on the fact that he was being bribed, rather than his view that the investment was in their best interests. Brown's customers suffered losses of more than $100,000 as a result of his purchases of NXTD's stock in their accounts.

17. Auerbach, Mitchell, and Pereira frequently communicated about their scheme via Wickr, an end-to-end encrypted and content-expiring messaging application, to conceal and destroy their communications concerning the scheme.

    **A.**    **From July 2014 to November 2014, Pereira Paid Mitchell Approximately $74,000, at Least in Part to Bribe Brown to Buy NXTD Stock in His Customers' Accounts**

18. In or about July 2014, Mitchell introduced Pereira to Brown. After the meeting, Mitchell told Pereira that Brown was interested in purchasing NXTD stock in his customers' accounts at his employer, Broker-Dealer-1, a Staten Island-based registered broker dealer, but needed a "financial incentive" to do so.

19. On July 8, 2014, Pereira caused NXTD to enter into a two-month "consulting agreement" with M&S Holdings ("Purported M&S Consulting Agreement"), which Mitchell controlled. Under the terms of that agreement, NXTD agreed to pay M&S Holdings a total of $42,000 in exchange for "investor relations services" that included "advising NXT[D]'s management concerning marketing ideas, investor profile information, methods of expanding

NXT[D]'s investor support and increasing investor awareness of NXT[D]." Mitchell and Pereira knew, however, that the true purpose of the agreement was to provide a guise through which NXTD could pay bribes to Brown through M&S Holdings.

20. On July 9, 2014, Brown began purchasing NXTD stock for his customers.

21. Shortly thereafter, Pereira visited Broker-Dealer-1's office on Long Island where Brown worked to talk to Brown and other brokers about NXTD. Following the meeting, Brown began purchasing more NXTD stock in his customers' accounts.

22. From July 15, 2014 to September 3, 2014, Pereira caused NXTD to send four wire transfers totaling $44,000 to M&S Holdings' bank account, from which Mitchell knowingly withdrew cash to pay Brown. In accordance with Pereira and Mitchell's agreement concerning the Purported M&S Consulting Agreement, Mitchell used those funds to pay Brown a cash bribe of at least $5,000.

23. On September 9, 2014, NXTD announced that it had closed on an underwritten public offering of its common stock and warrants, which caused its stock price to drop. Brown complained about this development to Mitchell, who arranged a meeting with Pereira on September 13, 2014.

24. At the meeting, Brown and Pereira formally agreed that, going forward, Pereira would pay Brown, in cash and through Mitchell, 10% of the value of NXTD stock that Brown purchased in his customers' accounts.

25. Accordingly, from September 24, 2014 to November 20, 2014, Pereira caused NXTD to send M&S Holdings three additional wires totaling $30,000, and Mitchell withdrew cash from the account to pay Brown. For example, in or about October 2014, Brown again met with Mitchell in Manhattan, where Mitchell paid him a $10,000 cash bribe on behalf of Pereira.

7

26.     In sum, between July 2014 and November 2014, Pereira paid Mitchell approximately $74,000, and Mitchell paid Brown at least $15,000 in cash bribes.

27.     From July 9, 2014 to December 1, 2014, Brown purchased a total of 231,253 shares of NXTD in his customers' accounts at a gross cost of more than $566,079.  Brown knowingly or recklessly failed to tell any of his customers that he was buying NXTD stock in their accounts because he was being paid bribes by Pereira through Mitchell.

      **B.**     **In 2015, Pereira Paid Auerbach and Mitchell Over $62,000, at Least in Part to Bribe Brown to Buy NXTD Stock in His Customers' Accounts**

28.     On January 15, 2015, Pereira caused NXTD to enter into a "Consulting Agreement" with Excelsior similar to the agreement NXTD had entered into with M&S Holdings ("Purported Excelsior Consulting Agreement").

29.     Under the terms of this agreement, Excelsior, the investor-relations firm run by Mitchell and Auerbach, agreed to "[a]ssist [NXTD] in introductions to investor relations companies, media outlets, analysts or broker dealers" and "conduct meetings in person or by telephone, with prospective brokers or the investment public."  In exchange, NXTD agreed to pay Excelsior a monthly fee of $5,000 and 5,000 shares of common stock.  The agreement also provided that NXTD would reimburse Excelsior for any expenses that NXTD incurred.  Like the Purported M&S Consulting Agreement, the Purported Excelsior Consulting Agreement provided a guise through which Pereira could pay Auerbach and Mitchell to funnel bribes to Brown.

30.     On March 3, 2015, Pereira emailed Auerbach asking, "Can we get some support today?," indicating that he wanted Auerbach to drive up the volume and price of NXTD stock, including through paying Brown to purchase the stock in his customers' accounts.  That day, Brown purchased 14,000 shares of NXTD stock in two customer accounts, with the trades

8

executing at 3:56:21 p.m. and 3:59:28 p.m.  The next day Brown purchased 4,500 shares of NXTD for a third customer, with the trade executing at 3:51:19 p.m.

31. On September 17, 2015, Mitchell emailed Pereira an invoice addressed to NXTD and in the amount of $12,000 for a purported "Investor Relations event for brokers and investors." Pursuant to the Purported Excelsior Consulting Agreement, NXTD was obligated to reimburse Excelsior for the expense.

32. The September 17, 2015 invoice was, in reality and as Mitchell knew, not for an "Investor Relations event for brokers and investors."  Rather, Mitchell knew the invoice was being used to disguise the payment of a cash bribe from Pereira to Brown that would be paid through Mitchell or Auerbach.

33. On September 24, 2015, Pereira caused NXTD to wire $12,000 to a bank account in the name of Excelsior that Mitchell and Auerbach controlled.

34. Auerbach and Mitchell did not withdraw cash from the Excelsior account to pay a cash bribe to Brown because they were concerned that a large cash withdrawal might draw scrutiny from the bank.

35. Instead, Auerbach pawned a Rolex watch he owned, and paid Brown with the cash he received for the watch.  On September 28, 2015, Auerbach left $5,000 in cash—the proceeds from the sale of the watch—in an envelope with the doorman at Auerbach's Manhattan apartment building.

36. Brown drove to Manhattan that day and picked up the envelope.

37. Brown then texted Auerbach, "Thank you."

38. Auerbach replied to Brown by text message, saying, "All good.  [The pawn shop employee] says thanks for the watch."

39. Auerbach knew or was reckless in not knowing that he made this payment to Brown in exchange for Brown's purchases of NXTD stock in his customers' accounts.

40. On September 29, 2015, Mitchell disbursed the $12,000 that Pereira had sent to Excelsior's bank account five days earlier by issuing a $3,000 check to himself and a $9,000 check to Auerbach.

41. These payments represented compensation for Auerbach's and Mitchell's roles in arranging the bribes to Brown, and in the case of Auerbach, additional compensation to reimburse him for the value of his Rolex watch.

42. In sum, between January 2015 and October 2015, Pereira caused NXTD to wire Excelsior a total of $62,689.00, and Auerbach and Mitchell paid Brown at least $5,000 in cash bribes.

43. During this time period, Brown, operating out of Broker-Dealer-1's Long Island office, bought a total of 107,640 additional shares of NXTD stock for his customers at a gross cost of $235,584. Brown knowingly or recklessly failed to tell any of his customers that he was buying NXTD stock in their accounts because he was being paid cash bribes by Pereira through Mitchell and Auerbach.

## CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder (Against All Defendants)**

44. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 43.

45. Defendants, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness, (1) employed devices, schemes, and artifices to

10

defraud; and/or (2) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any person.

46. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants and their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

### II.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

### III.

Ordering Defendants to pay civil monetary penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

IV.

Permanently prohibiting Mitchell and Brown from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

V.

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
October 4, 2019

_____
MARC P. BERGER
REGIONAL DIRECTOR
Sanjay Wadhwa
Sheldon L. Pollock
John O. Enright
Tejal D. Shah
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0121 (Shah)
shahte@sec.gov